UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FRANK CINATL, | ) |
| | ) No. 13 CV 7565 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration, | ) ) ) |
| | ) December 14, 2015 |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

This action is Plaintiff Frank Cinatl's second appeal of the Social Security Administration's determination that he is not entitled to disability benefits. Before the court are the parties' cross motions for summary judgment. For the following reasons, Cinatl's motion is granted, the Commissioner's is denied, and the case is remanded for further proceedings consistent with this opinion:

**Procedural History**

Cinatl applied for disability insurance benefits ("DIB") in December 2005, claiming that neck and shoulder pain, along with depression, have left him unable to work since March 23, 2001. (See Administrative Record ("A.R.") 139-143.) A hearing was held in November 2008 before an administrative law judge ("ALJ") at which Cinatl, his wife, a medical expert ("ME"), and a vocational expert testified. (Id. at 25-88.) After the ALJ denied Cinatl's application in April 2009, (id. at 15-24), and the Appeals Council declined his request for review, (id. at 1-5, 12-24), he

brought a successful action in this court to reverse and remand the Commissioner's final decision, *see Cinatl v. Astrue*, No. 10 CV 2398, 2011 WL 1743408 (N.D. Ill. May 6, 2011). The Appeals Council then remanded the case to the same ALJ to consider additional evidence. (A.R. 807-10.) After conducting a supplemental hearing in February 2013 at which new MEs testified, (id. at 680-717), the ALJ again denied Cinatl's application for DIB on June 24, 2013, (id. at 718-44). Because the Appeals Council declined review, the ALJ's decision represents the final decision of the Commissioner of the Social Security Administration. *See Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Cinatl filed this lawsuit seeking judicial review, *see* 42 U.S.C. § 405(g), and the parties have consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 3).

## Facts

Cinatl is a 49-year-old man who worked loading and unloading baggage for an airline from 1998 until 2000. (A.R. 162, 444.) He claims he stopped working after a car accident in March 2000 because of neck and shoulder pain and depression. (See id. at 447, 726, 949.) Cinatl's insured status expired on March 31, 2005. (See id. at 27-28, 724-25, 922-23.) At the supplemental hearing before the ALJ, Cinatl presented both documentary and testimonial evidence in support of his claims. Although a prior decision in this case already summarized much of the relevant medical evidence and testimony, *see Cinatl*, 2011 WL 1743408, at *1-4, the court details some of the same evidence here for the sake of continuity and

summarizes additional evidence Cinatl submitted after that decision. The court will not address Cinatl's mental impairments because they are not at issue here.

**A.     Medical Evidence**

After the car accident in March 2000, Cinatl received treatment from St. Alexius Medical Center. (See, e.g., A.R. 227, 447.) Initial cervical and joint MRIs and electromyography ("EMG") tests showed only mild abnormalities, (id. at 218, 220, 223), but he continued to report pain despite having epidural steroid injections in August and November 2000, (id. at 221, 227). Cinatl also complained of tingling and numbness in his left fingers during doctor visits throughout the year after the accident. (See id. at 221, 234, 452, 947, 949.) He was diagnosed with cervical radiculopathy in November 2000, and underwent surgery on his left shoulder in December 2000. (Id. at 221, 255.) He reported doing "very well" in March 2001, exhibiting full range of motion and improved strength through physical therapy. (Id. at 252.)

However, Cinatl started experiencing neck pain again in August 2001, (id. at 251), and a cervical MRI in May 2003 showed degenerative disc changes, ventral ridging, a "mild degree of spinal cord distortion at C5-C6 and C6-C7," and neural foraminal narrowing, (id. at 634-35). A cervical myelogram and CT scan conducted in October 2003 showed mild to moderate narrowing of the spinal canal at C4-C5 and C5-C6 and degenerative osteophytic spurring with "compression on the right nerve root at [those] levels." (Id. at 316-17, 936-37.) Cinatl began reporting numbness on his right side in late 2003, and his physicians noted continued

3

complaints of numbness through the end of 2005. (See, e.g., id. at 264, 298, 300, 309, 318, 343, 936.) A May 2004 EMG revealed diminished reflexes in his biceps, triceps, and one of his forearms, and other symptoms consistent with carpal tunnel syndrome. (Id. at 297, 304.) In February 2005, an examination of Cinatl's cervical spine showed 60 degrees flexion with no pain, 10 degrees extension with pain, and 15 degrees lateral bending with pain. (Id. at 318-19.) Cinatl also exhibited decreased strength in his right shoulder. (Id.)

After Cinatl applied for DIB, state agency consultant Dr. Charles Kenney conducted a physical residual functional capacity ("RFC") assessment of Cinatl in February 2006. (Id. at 353-60.) Dr. Kenney opined that Cinatl was capable of performing light work, (id. at 354), and another state agency consultant concurred with this assessment, (id. at 361).

## B. Medical Expert Testimony

At the supplemental hearing in February 2013, the ALJ heard testimony from an ME, Dr. James Haynes. (A.R. 690-711.) The ALJ asked the ME a number of questions regarding Cinatl's spine impairment. At first the ME testified that Cinatl's impairment did not meet the requirements of Listing 1.04. (Id. at 691.) He said that there was insufficient evidence of nerve root compression because the record shows only "mild" stenosis. (Id. at 693.) The ME further testified that Cinatl had no demonstrable limitations of motion in his cervical spine and no documented motor loss, muscle weakness, or sensory or reflex loss. (Id.) When Cinatl's counsel directed his attention to a November 2003 doctor's evaluation, the ME conceded

4

that the report indicated numbness and tingling in Cinatl's right arm, but he said that the "severity level" was "not there." (Id. at 699.) The ME also subsequently acknowledged that the record included documentation of limited range of motion in Cinatl's neck and muscle weakness in his right tricep. (Id. at 700-01.) When Cinatl's counsel pointed out that Listing 1.04 does not specify a severity level for muscle weakness or motor loss, the ME agreed, but responded that "we're also allowed to use our brains and think if severity is an issue or not." (Id. at 701-02.) Shortly thereafter the ME testified that Cinatl's neck impairment did in fact meet Listing 1.04 criteria "in a mild way," (see id. at 702), but he later testified that Cinatl did not exhibit the requisite sensory or reflex loss required by the listing, (see id. at 706).

**C.    ALJ's Decision**

On June 24, 2013, the ALJ issued a decision finding that Cinatl is not entitled to DIB. (A.R. 721-39.) In applying the standard five-step sequence for assessing disability, *see* 20 C.F.R. § 404.1520(a); *Stepp v. Colvin*, 795 F.3d 711, 716 (7th Cir. 2015), the ALJ found at step one that Cinatl has not engaged in any substantial gainful activity since his alleged disability onset date, (id. at 725). At step two the ALJ found that Cinatl has "at least one" severe impairment. (Id. at 725.) Although he did not specify the qualifying impairment, the ALJ noted that Cinatl based his benefits application on "residuals of injuries to his back and arm." (Id. (internal quotations omitted).) At step three the ALJ found that none of Cinatl's impairments are of listings-level severity, either individually or in

5

combination. (Id. at 728-31.) Before turning to step four, the ALJ determined that Cinatl has the RFC to perform light work. (Id. at 731-37.) Then at step four, the ALJ concluded that although Cinatl is unable to return to his previous work, he is able to perform other jobs which exist in the regional economy. (Id. at 737-39.) Accordingly, the ALJ found that Cinatl is not disabled and denied his application for DIB. (Id. at 739.)

**Analysis**

Cinatl argues that the ALJ misapplied Listing 1.04(A) in determining whether he is disabled at step three of the sequential evaluation process. (R. 9, Pl.'s Mem. at 3.) He also argues that the ALJ demonstrated a level of bias that made a fair decision impossible. (Id. at 8.) This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp*, 795 F.3d at 718 (internal quotation omitted). Under that standard, the court will not substitute its judgment for the ALJ's, reconsider evidence, or reweigh the claimant's credibility. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). At the same time, the court will not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence" and will ensure that the ALJ built a "logical bridge from the evidence" to the conclusion. *Minnick*, 775 F.3d at 935 (internal quotations and citations omitted).

## A. Listing 1.04(A)

Because a claimant with a qualifying impairment is presumed to be disabled, ending the need for further inquiry, the court begins with Cinatl's argument that the ALJ improperly evaluated whether his condition meets Listing 1.04(A). *See Sullivan v. Zebley*, 493 U.S. 521, 525 (1990); *see also Kastner v. Astrue*, 697 F.3d 642, 646-47 (7th Cir. 2012); 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. The claimant bears the burden to prove that his condition meets or equals a listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Listing 1.04(A) describes disorders of the spine involving the compromise of nerve roots or the spinal cord where the following criteria are present:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.04(A).

Cinatl argues that the ALJ mishandled the medical evidence and applied an erroneous "clinical severity" requirement in determining that his cervical spine impairment does not meet Listing 1.04(A). (See A.R. 728-31.) The court agrees. First, the ALJ found that it was "implicit or explicit" from medical opinions that Cinatl's impairments do not meet Listing 1.04(A) requirements. The ALJ cited results from two MRIs and an EMG test performed in 2000 which did not demonstrate nerve root compromise in Cinatl's cervical spine. (See id. at 729.) But those early tests predate ample evidence showing that Cinatl's condition

7

deteriorated over time. For example, a May 2003 MRI showed degenerative disc changes, ventral ridging, a "mild degree of spinal cord distortion," and neural foraminal narrowing. (Id. at 634-35.) An October 2003 cervical myelogram disclosed mild to moderate narrowing of the spinal canal and degenerative osteophytic spurring with mild central spinal stenosis. (Id. at 316-17.) Then in October 2005, another MRI showed bilateral foraminal stenosis and central spinal stenosis that appeared "worse/more severe" when compared to the May 2003 MRI. (Id. at 340.) Accordingly, the court finds that the ALJ erred in relying on earlier reports to the exclusion of these more recent records showing nerve root compromise.

The ALJ attempted to diminish the relevance of these findings by stating that they "*might*" support a conclusion of nerve root compromise, (id. at 729 (emphasis in original)), but it is unclear why he ultimately determined that those testing results fell short of demonstrating that condition. In fact, record evidence and expert testimony both establish that Cinatl had nerve root compromise in his cervical spine with evidence of nerve root compression. In November 2000, Cinatl was diagnosed with cervical radiculopathy. (Id. at 221); *see* 2 *Attorneys Medical Desk-book* § 26:8 (radiculopathy is synonymous with root nerve compression). An orthopedic surgeon wrote in November 2003 that an MRI and myelogram from earlier that year showed "compression on the right nerve root" at C4-C5 and C5-C6. (A.R. 936.) And though the ME's testimony was at times conflicting, the ME did testify more than once that there was evidence of nerve root compromise and

compression. (See id. at 691, 704, 706-07.) Accordingly, the ALJ's conclusion that there was insufficient evidence of nerve root compromise with nerve root compression lacks support.

Second, the ALJ found that the medical evidence of Cinatl's impairments did not satisfy "clinical severity requirements explained in § 1.00E(1) and § 1.00E(2)" and "severity criteria" in Listing 1.04(A). (See id. 730-31.) As an initial matter, the court agrees with Cinatl that in this case, the phrase "severity criteria" is misleading to the extent it implies that his symptoms must meet Listing 1.04(A)'s requirements in a more than minimal way. When read together, § 1.00(E) and Listing 1.04(A) only require specific, detailed documentation of *some* degree of limited spine motion, motor loss, and sensory or reflex loss.[1] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.00(E)(1)-(2) & 1.04. The listing symptoms need only be present for a claimant to be found disabled under Listing 1.04(A), and unless a listing specifically provides otherwise, it is generally unnecessary to provide

---

[1] Section 1.00E provides, in relevant part:

> Examination of the spine should include a detailed description of gait, range of motion of the spine given quantitatively in degrees from the vertical position (zero degrees) or, for straight-leg raising from the sitting and supine position (zero degrees), any other appropriate tension signs, motor and sensory abnormalities, muscle spasm, when present, and deep tendon reflexes. . . . Additionally, a report of atrophy should be accompanied by measurement of the strength of the muscle(s) in question generally based on a grading system of 0 to 5, with 0 being complete loss of strength and 5 being maximum strength. A specific description of atrophy of hand muscles is acceptable without measurements of atrophy but should include measurements of grip and pinch strength.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(E).

9

information about the intensity, persistence, or limiting effects of the symptoms. 20 C.F.R. § 404.1529(d)(2); *see also Kastner*, 697 F.3d at 649 (noting that any restriction on movement that a doctor considers a medical limitation of motion will satisfy the limitation-of-motion requirement); *Smith v. Astrue*, No. 09 CV 6210, 2011 WL 722539, at *12 (N.D. Ill. Feb. 22, 2011) ("Listing 1.04(A) does not require any particular degree of motor loss."). After the ME erroneously testified at the supplemental hearing that it was "just silly" to consider a claimant disabled because he minimally meets the listing requirements, (A.R. 702, 707), the ALJ explained that Listing 1.04(A) only requires the documented existence of certain symptoms and does not require that such symptoms reach a particular level of intensity, (see id. at 704). However, the ALJ then wrote in his decision that Cinatl's objection to the ME's testimony "ignores the clinical severity requirements" in § 1.00E. (Id. at 730-31.) This portion of the decision is unclear because, as Cinatl points out, § 1.00E describes the manner and format in which clinical findings should be reported in the medical record, not the "severity" required of such findings.[2] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.00(E)(1)-(2).

At any rate, of greater concern is the fact that the ALJ did not address evidence demonstrating that Cinatl's impairment does meet the listing requirements. Although an ALJ need not discuss every bit of record evidence that supports a claimant's position, he may not "cherry-pick" evidence that supports his

---

[2] Portions of § 1.00E(1) address the proof required to show "significant" motor loss, but Listing 1.04(A) does not require that claimants show a particular degree of motor loss.

10

conclusion. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Kastner*, 697 F.3d at 650 (noting that ALJ may not selectively consider medical reports in evaluating spinal disorders at step three). In determining that Cinatl's impairments did not meet Listing 1.04(A), the ALJ cited to largely benign clinical findings from 2000 and 2001. (A.R. 731.) He also referred to records from early 2004 noting "excellent strength" in Cinatl's arms while dismissing reports of muscle weakness as "medically mild" and generally insignificant. (Id.) But the ALJ neglected to mention findings from a May 2004 EMG that showed diminished reflexes in Cinatl's biceps, triceps, and one of his forearms. (Id. at 304.) Nor did he discuss a February 2005 examination showing decreased cervical extension and lateral bending, as well as decreased right shoulder strength. (Id. at 318-19.) As this court noted in its prior decision, the ALJ's failure to evaluate the strongest evidence in favor of Cinatl for the purposes of meeting Listing 1.04(A) precludes meaningful review. *See Cinatl*, 2011 WL 1743408, at *11 (citing *Brindisi ex rel. Brindisi v. Barhart*, 315 F.3d 783, 786 (7th Cir. 2003)). On remand, the ALJ must confront the evidence of limitation of motion, motor loss, and reflex loss that does not support his conclusion. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

As for sensory loss, the ALJ wrote that Cinatl reported "only occasional numbness" in February 2004. (Id. at 731.) But again, the listing only requires some level of sensory loss, and the record is replete with Cinatl's complaints of numbness throughout the relevant time period. (See, e.g, id. at 221, 234, 298, 309, 318 452, 936-37, 947, 949.) Although a 2004 EMG noted "normal sensation to pinprick and

11

touch in both upper extremities," (id. at 304), the ALJ makes no reference to that particular finding and it is unclear whether those test results are inconsistent with numbness that comes and goes. To the extent the ALJ relied solely on a lack of objective medical evidence corroborating numbness, such reliance also was erroneous. At the supplemental hearing the ME acknowledged that Cinatl frequently complained of numbness, but he testified that there was no "clinically established" sensory loss, prompting the ALJ to comment that the regulations require "medical evidence" of sensory loss, "not [just] the complaint by the patient." (Id. at 708.) However, according to 20 C.F.R. § 404.1529(c)(2), while objective evidence is considered "a useful indicator" of symptoms such as sensory deficit, a claimant's statements about the intensity and persistence of his symptoms should not be rejected "solely because the available objective medical evidence does not substantiate [his] statements." If the ALJ had other reasons besides a lack of objective evidence for disregarding Cinatl's complaints of sensory loss, those reasons are unclear. Because such an explanation is absent and there is evidence that Cinatl had sensory loss as well as other symptoms required by Listing 1.04(A), the court is unable to determine that the ALJ properly considered all of the evidence in analyzing step three. On remand, the ALJ may very well conclude again that Cinatl has not met the requirements of Listing 1.04(A), but the ALJ must explain his conclusion in a way that assures the court he considered all relevant evidence.

Notably, the ME's testimony during the supplemental hearing was often contradictory and at times, inaccurate. The ME first testified that there was

insufficient evidence of a qualifying spine impairment to be evaluated under Listing 1.04. (Id. at 691.) He also testified that there was no documented evidence of nerve root compression, limited range of motion, motor loss with associated muscle weakness, or sensory or reflex loss. (Id. at 692-93.) But upon further questioning by Cinatl's counsel and the ALJ, the ME changed course and testified that there actually *was* evidence of nerve root compromise, some limitation of range of motion, and mild weakness in Cinatl's triceps. (Id. at 704-08.) Indeed, the ME even stated at one point that Cinatl's impairments meet the listing criteria "in a mild way." (Id. at 702.) Then the ME changed course yet again and testified that while there was some evidence of limitation of motion and muscle weakness, there was no evidence of sensory or reflex loss. (See id. at 707-08.) Such conflicting testimony is concerning to say the least.

The ME also implied that deeming Cinatl disabled because he just barely meets the listing criteria would be "silly" and stated that "we're also allowed to use our brains and think if severity is an issue or not." (Id. at 701-02, 705.) That is a legal rather than a medical judgment which, as already explained, is actually incorrect. *See Wilder v. Apfel*, 153 F.3d 799, 802 (7th Cir. 1998) (faulting an ME for "offering gratuitously an erroneous legal opinion unfortunately adopted by the [ALJ] in her opinion"). The Seventh Circuit has instructed that if an ME's testimony "dropped out as hopelessly inconclusive as well as contaminated by legal confusion," then an ALJ could resort to using a previous ME's testimony. *See Wilder*, 153 F.3d at 803. Here, it is unclear to what extent the ALJ relied on the

13

first ME's testimony in his step-three analysis. Furthermore, the first ME's testimony is of limited use here because she focused primarily on Cinatl's RFC and whether certain medical evidence related back to the time period at issue, and did not provide meaningful testimony regarding the specific requirements of Listing 1.04(A). (See id. at 29-31, 721); *see also Smith*, 2011 WL 722539, at *10 (noting that a claimant's RFC for light work "has no bearing on whether she met the requirements of Listing 1.04(A)"). Accordingly, in light of the infirmities in the second ME's testimony and the insufficient level of detail in the first ME's testimony, the court directs the ALJ on remand to seek additional ME testimony on whether Cinatl's impairment satisfies Listing 1.04(A)'s requirements. *See Wilder*, 153 F.3d at 803 (criticizing ALJ's reliance on ME's "inconclusive" testimony because the ALJ only referred to portions favoring denying benefits while "nowhere mention[ing] [the ME's] equal and opposite" testimony favoring granting benefits).

B. Allegation of Bias

The court next addresses Cinatl's bias argument to determine whether this matter should be remanded to a different ALJ. Cinatl contends that the ALJ demonstrated bias that made a fair decision impossible. (R. 9, Pl.'s Mem. at 8.) Specifically, Cinatl asserts that after the ME agreed that Cinatl met the requirements of Listing 1.04(A) "in a mild way," the ALJ then interjected and said, "[n]o, no, no. We have to be very specific because remember it's the claimant's job to obfuscate and confuse the record. He wants to make sure that all of this is congealed into an indistinct mask." (A.R. 702.) The Seventh Circuit sets an

exacting standard for determining whether an ALJ's display of bias or hostility requires remanding the case for a hearing before a new ALJ. *See Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007) (citations omitted). The court begins by presuming the ALJ is unbiased and will not remand a case when isolated parts of an ALJ's conduct are challenged but the record as a whole demonstrates fundamental fairness. *See id.* (citations omitted). It is only after a claimant demonstrates that the ALJ "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible" that the presumption is rebutted, the findings set aside, and the matter remanded for a new hearing. *See id.* (citing *Liteky v. United States*, 510 U.S. 540, 556 (1994)).

A review of the hearing transcript as a whole makes clear that the ALJ's statements fall short of the extreme conduct necessary to sustain a claim of bias. Immediately after making the offending comments, the ALJ quickly retracted his accusations and apologized to Cinatl. (See A.R. 702.) He also explained that "these are very, very technical issues" and that he wanted to "make sure that this record is as clear as possible[.]" (Id. at 703-04.) At most the ALJ's comments were expressions of impatience, frustration, or perhaps anger, all of which are within the bounds of permissible—albeit imperfect—efforts at courtroom administration. *See Keith*, 473 F.3d at 790 (citing *Liteky*, 510 U.S. at 555-56). Accordingly, the court finds that a remand to a different ALJ is not warranted.

## Conclusion

For the foregoing reasons, Cinatl's motion for summary judgment is granted and the Commissioner's is denied. The case is remanded for further proceedings consistent with this opinion.

**ENTER:**

_Young B. Kim_
**Young B. Kim
United States Magistrate Judge**